Filed 2/15/23  S.B. v. Heather B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| S.B.,<br><br>    Appellant,<br><br>        v.<br><br>HEATHER B. et al.,<br><br>    Respondents. | F083931<br><br>(Super. Ct. No. 19CEFL01358)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Amy K. Guerra, Judge.

McCormick, Barstow, Sheppard, Wayte & Carruth, Jerry D. Casheros and Ella A. Moberg, for Appellant.

No appearance made for Respondents.

-ooOoo-

S.B. filed a petition for grandparent visitation in the family court. In the petition, she sought visitation—for herself and her boyfriend, K.V.—with her young granddaughter. The family court denied the petition and S.B. appealed. We affirm.

## FACTUAL AND PROCEDURAL OVERVIEW

This matter arose from a "petition for grandparent visitation" pursuant to Family Code section 3104 that was filed on March 11, 2019, in the Fresno County Superior Court by S.B. S.B. sought court-ordered visitation with her young granddaughter, A.R. (S.B. is A.R.'s paternal grandmother). Specifically, S.B.'s petition sought the following relief: (1) "[A]n Order of this Court granting Petitioner regular scheduled visitation with [A.R.], to occur at least once per week"; and (2) "[A]n Order of this Court directing [A.R.'s mother, Heather B.] to have Petitioner and/or [Petitioner's boyfriend, K.V.] provide such child care as is needed or appropriate for [A.R.] during [Heather B.'s] own work hours, in lieu of a day care program." (Unnecessary capitalization omitted.) Heather B. (A.R.'s mother) filed an opposition to the petition on May 7, 2019. A.R., who was born in December 2014, was four years old when S.B. filed her petition for grandparent visitation.

On June 14, 2019, S.B. filed an amended petition seeking slightly different relief, as follows: (1) "[A]n Order of this Court granting Petitioner or Petitioner and [K.V.] regular, scheduled visitation with [A.R.], to occur at least once per week and including some overnights"; and (2) "[A]n Order of this Court directing [Heather B.] to have Petitioner and/or [K.V.] provide such child care as is needed or appropriate for [A.R.] during [Heather B.'s] own work hours, in lieu of a day care program and allowing Petitioner and [K.V.] to attend and participate in [A.R.'s] school and extra-curricular activities." (Unnecessary capitalization omitted.) Heather filed an opposition to the amended petition on July 19, 2019.

On October 7, 2019, the court joined A.R.'s biological father, Vincent N., to the matter (S.B. is Vincent N.'s mother). On November 13, 2019, Vincent N. filed a

declaration opposing S.B.'s "request for grandparent visitations." (Unnecessary capitalization omitted.)

S.B.'s amended petition for grandparent visitation proceeded to trial or contested hearing, which was held over a number of nonconsecutive days beginning on August 3, 2021. A.R. was six years old at that time. The family court had previously ordered that Heather and Vincent (who was recognized by the family court as A.R.'s biological father) were to have joint legal custody and joint physical custody of A.R.

## A. Trial Evidence

### (i) Petitioner S.B.'s Case

#### a. Testimony of S.B.

S.B. testified at the contested hearing. S.B. had worked as a cardiac nurse for over two decades. S.B. first met A.R. in September 2015, when Heather and Vincent brought the child over for a visit for the first time (A.R. was around nine months old at the time). Thereafter plans were made for S.B. to "start watching A.R.," and S.B. began doing so, regularly. S.B. saw A.R. a lot over the next three years, including when the child came over for overnight visits. When A.R. was two and a half years old, S.B. designated a bedroom in her house for A.R. When A.R. got older and started attending daycare, S.B. frequently picked A.R. up from there. S.B. attended events like Grandparents' Day at A.R.'s daycare.

S.B. would dotingly look after A.R. when A.R. was with her, including feeding her, bathing her, putting her in pajamas. S.B. occasionally took A.R. to the doctor (twice a year at a minimum) and would pay for the doctor visits. S.B. took A.R. for activities and also on trips, such as to Pismo Beach and Disneyland. S.B.'s boyfriend, K.V., would accompany them. S.B. and K.V. had been together for over a decade and lived together; K.V. also watched A.R. and participated in events such as Grandparents' Day at her daycare. S.B.'s point of contact regarding A.R. was A.R.'s mother, Heather.

3.

When A.R. was conceived and born, Heather was married to Andrew R. By the time S.B. first met A.R., Heather and Andrew R. were separated; eventually they divorced. A paternity test established that S.B.'s son, Vincent, was A.R.'s biological father.

S.B. helped Heather financially, given her separation and eventual divorce. S.B. helped Heather to the tune of $5,000 to $10,000 in the form of both loans and gifts. Heather never repaid the loans.

S.B. and K.V. became friendly with Heather's family, attending events at each other's homes and going on outings together. S.B. and K.V. frequently went to dinner with Heather's mother, Lisa B.

A.R. had a routine when she spent time with S.B. and K.V., and they established normal boundaries as needed. S.B. testified: "She's a good kid and listened well."

Heather would complain to S.B. about Vincent not being engaged in A.R.'s life. In 2018, Heather raised the idea of reintroducing Vincent into A.R.'s life. S.B. was concerned about this possibility. S.B. described her concerns: "Being that [Vincent] had been [introduced] and left, that [A.R.] was getting older and would understand that he was her father and the fear that he would leave again and leave her questioning – like she would know he was there and then gone." However, S.B. was willing to be supportive. Nonetheless, shortly thereafter, S.B. and K.V. "lost contact and visitation of A.R."

S.B.'s last visit with A.R. was in October 2018; the visits ended abruptly. Heather came to pick A.R. up from S.B. and K.V.'s house that night, but the handoff became tense. S.B. explained: "[A.R.] had been having her temper tantrums again that day, which we had not seen in while, like a few weeks. So when Heather showed up at the door, I took her outside, shut the door while I told [A.R.] to stay inside. And told her I was worried because I was starting to see that behavior again in her. [¶] So I had went back inside and [K.V.] said counseling and does she need help paying for the counseling bills. And Heather found that offensive."

Heather subsequently cut off S.B.'s visits with A.R. without explanation; Heather simply texted, " 'You can't see her.' " The lack of contact was Heather's choice; had it been up to S.B., she would "[a]bsolutely" have continued to see her granddaughter. S.B. testified: "[S]he's family. She's a huge part of our life. She's – she's my first grandchild. I miss her." S.B. had made repeated efforts to reestablish visits with A.R.

Heather had cut off S.B.'s visits with A.R. twice before because Vincent had not wanted S.B. to have access to A.R. S.B. and Vincent's father were divorced and S.B. was estranged from Vincent. Since September 2015, when S.B. first met A.R., Vincent had stopped by S.B.'s house only once, to use the bathroom, but K.V. had asked him to leave.

On cross-examination, S.B. acknowledged she filed a small claims complaint against Heather in February 2019, after she had lost contact with A.R. In the complaint, S.B. sought repayment of $1,250 "borrowed" by Heather for "rug shampooer, food and beverages for multiple birthday parties, health insurance premiums, doctor bills, daycare sleeping mats," and other miscellaneous expenses. S.B. obtained a small claims judgment against Heather, but Heather had not paid anything. K.V. also filed a small claims action against Heather, seeking repayment for daycare payments, divorce attorney fee payments, and PG&E bill payments. Thereafter, in March 2019, S.B. retained an attorney to file and litigate a petition for grandparents' visitation.

S.B. further acknowledged on cross-examination that K.V. once commented that A.R. did not like Heather's boyfriend, Justin, and Heather found the comment "inappropriate." S.B. stated that when Heather picked A.R. up from S.B.'s house for the last time, Heather said she did not want K.V. left alone with A.R. (previously Heather had dropped A.R. off with just K.V. "[a]t least six times a year"). Finally, S.B. acknowledged she once called the police on K.V. shortly after they met, because they were yelling at each other and, not knowing him well at the time, she had panicked.

### b. Testimony of Beth F.

Beth F. was the assistant director of Kids Kare daycare. A.R. attended Kids Kare for two and a half years, during which time she exhibited some behavior problems. Beth F. testified that in December 2018, "[A.R.] had a very tough week, in terms of being aggressive with other children." At the end of the week, on December 21, 2018, Kids Kare told Heather that A.R. could no longer attend Kids Kare.

### c. Testimony of Heather B.

Heather B. was called as a witness in S.B.'s case. Heather testified she was A.R.'s mother and "very much a single mom." When A.R. was conceived, Heather was married to Andrew R. Heather had two older children with Andrew.

Vincent (whom Heather had known for a long time as a friend) was A.R.'s biological father. Vincent first met A.R. when she was about nine months old. Shortly thereafter, in September 2015, A.R. met S.B. for the first time, at S.B.'s house. Heather subsequently allowed S.B. to have visits with A.R. and to babysit her, but S.B. never kept A.R. overnight. When S.B. took A.R. for trips, Heather's mother went along too. S.B. never had A.R. overnight without supervision. S.B. and K.V. helped Heather financially for a while, but "everything [was required] to be paid back through small claims." Heather explained: "I was a single mom who needed help, and I feel like they took advantage of that." As for Vincent's presence in A.R.'s life, at the time it was "on-and-off."

Heather testified that S.B. and K.V. stopped seeing A.R. towards the end of 2018 "by their own choosing." Around that time, Heather had sought their support for reintroducing Vincent in A.R.'s life. Heather testified: "I needed them to understand that this was best for my child … to have a healthy, loving relationship with her dad. And I was encountering a lot of resistance with that with [S.B.] and [K.V.]" Heather added: "I was going to let [Vincent] in her life no matter what. That's her dad. He's just as

important as I am.  They did not agree with that.  [K.V.] would lose his mind.  It made me very uncomfortable."

A.R. had, at times, a "hard time identifying her emotions and being able to self-regulate" at daycare.  The behavior issues began around the time A.R. was spending the most time with S.B. and "were induced by a lack of schedule, boundaries, rules" while she was in S.B.'s care.  The behavior issues persisted at two different daycares that A.R. attended.  At the first daycare, Kids Kare, A.R. exhibited, in April 2018 and December 2018, behavior issues that were written up in incident reports.  After she moved to a different daycare, Brighten Academy, in early 2019, "[i]mmediately her behavior got better," but the behavior issues resurfaced "occasionally."  Heather acknowledged she was aware of two incident reports relating to incidents that occurred in October 2019 and in which A.R. acted out at Brighten Academy.  A.R. had to stop attending Brighten Academy that same month, because of these incidents.  Since then, A.R. had received therapy and by the time of trial, was exhibiting "normal behaviors for a six-year-old," and was "100 times better" than in the past.

Heather testified she was not comfortable with K.V. being around A.R.  Heather explained:  "It was almost as though, like, any time there was a male, whether it was Andrew, Vincent or when I started dating Justin, he would get so disturbed.  So it got to the point where either myself, Justin or our babysitter would show up to pick up [A.R.], [S.B.] wouldn't be there; it would be [K.V.], which I was under the impression that it was [S.B.]  And he would try to keep [A.R.] and not give her to who was supposed to be picking her up.  He did that to me multiple times.  He had made a comment about how he's [A.R.'s] main parent, which it was, honestly, just very unsettling for me."  K.V. also threatened to take A.R. out of the country, further unsettling Heather.  As to this threat, Heather testified:  "It terrified me to the point where I could not sleep at night.  I was sleeping with [A.R.]  I was terrified."  Heather testified that she later learned that much of

the time when A.R. was supposed to be watched by S.B., she was instead watched by K.V.

Heather testified that A.R. no longer had any memory of S.B. or K.V., and did not talk about them. Heather was asked whether she believed it would be detrimental to A.R. to be reintroduced to S.B. and K.V. Heather said: "100 percent know it would be awful and detrimental and not for her best interest." Heather described two prior instances when S.B. and K.V. had cut off their relationship with Heather and A.R. Heather said: "First time was in 2016, I believe. They got upset because my main concern has also been raising my three kids as close as possible. If that meant [A.R.] being able to spend time at Andrew's house and I was all for that, [K.V.] and [S.B.] did not like that. So they dropped her stuff off on my apartment patio that faced the parking lot. They put her stuff in trash bags and threw it over the patio." Heather observed: "I give people a lot of chances. So there was an apology made. And they started babysitting again. And this had to have been in 2017. They got upset again over something, and I believe that was because Andrew was seeing [A.R.] And I wasn't needing them to babysit as much, either. So they got upset about that. So while my friend and I were having dinner at my house, they dropped [A.R.'s] stuff off in trash bags again at my front door."

Heather added: "And then in 2018, they got mad because – to me, [A.R.] is just as much Vincent's as she is mine. And I'm nobody to deny her of having a relationship with him. So they got upset that I was allowing Vincent to come back and be a big part of her life and giving him that without questioning him and trusting him to – I was trusting the situation. He says he can be a good dad. I'm trusting that he is going to be a good dad. So they got upset … [¶] … [¶] And I had multiple text messages coming in from [S.B.] about how she's throwing in the towel. She's done with us. All sorts of stuff. This is the third time." Heather continued: "So these messages were the third instance where this individual was choosing to not be a part of my child's life because of issues that she had with my parenting. And, to me, my children are not disposable. My

children are not objects that you can walk away from. [¶] So at that point I was like, okay, this is the third time this has happened. My daughter deserves more than this." S.B. and K.V. called Heather in November 2018, three weeks after telling her they were going to stop seeing her and A.R. At that point, Heather "denied [A.R.] going over there." That was when K.V. threatened he would take A.R. out of the country.

### d. Testimony of Dr. Richard Engeln

Dr. Richard Engeln, a clinical psychologist, testified as an expert witness on grandparent visitation issues, on behalf of S.B. Dr. Engeln interviewed S.B., K.V., S.B.'s daughter (Amber N.), and a former girlfriend of K.V. (Gina). Dr. Engeln did not meet A.R. or interview her parents.

Dr. Engeln testified about his interview with Gina, specifically one incident she described. Gina and K.V. were together for four years and had a baby together, but the baby died from SIDS. Dr. Engeln said: "When [Gina] became pregnant, they had differences, perceptions on that pregnancy. [K.V.] thought she should get an abortion. And in one dramatic exchange, while [K.V.] was in the kitchen, he raised a knife and said, 'Let me do the abortion myself.' " Dr. Engeln continued: "They were separated by about ten feet. She was not – she states she was not frightened, but she did file for [a] restraining order because the intensity of their verbal argument and trauma in expressing that was loud. And so, she filed for a restraining order." The restraining order was eventually "discarded." [K.V.] and Gina were together over two decades ago. Dr. Engeln stated, as to the knife incident: "I think that was drama in a crisis that these people were experiencing." Dr. Engeln added: "I do not think it was a response that indicated intent to do harm. I think it was a response that indicated drama. With a statement, 'Let me do the abortion,' it was a drama in responding to this crisis."

As for his interview with S.B.'s daughter, Amber, Dr. Engeln testified that Amber and S.B. had been estranged but had reconciled over the past five or six years. Dr. Engeln said: "They had gone four to five years without speaking to each other, so

there was no contact; but then they reached out to each other and began a relationship. Now Amber lives with her boyfriend. She has a three-year-old child, and there's positive bonding between the two families."

Dr. Engeln was asked whether S.B. was an attachment figure for A.R. He answered: "My conclusion was that there's documentation that she has had a significant amount of time with the child until [almost] age four and that there was – there was a love relationship that developed." Dr. Engeln added that it reasonably appeared that S.B. formed strong bonds with A.R.

### e. Testimony of K.V.

K.V. appeared as a witness in S.B.'s case. He worked for PG&E and also had various business interests. K.V. last saw A.R. towards the end of October 2018, when Heather cut off contact with A.R. S.B. and K.V. regularly babysat A.R., including over weekends. Heather would tell them that A.R. would look forward to spending time with them. Heather never expressed any concerns about K.V. watching A.R. one-on-one, in S.B.'s absence. Heather asked K.V. to watch A.R. on multiple occasions. S.B. and K.V. would follow a consistent and predictable schedule in terms of mealtimes, nap time, bath time, and bedtime when watching A.R.

K.V. said: "As [A.R.] stayed with us more, and spent more time with us, I grew more affection for her. I started to feel responsibility for her. She started to become a part of our life, a family member." As for S.B.'s feelings towards A.R., he said: "She was very excited to have her first grandchild. She often went to the store, made sure we had food, clothing, everything that [A.R.] may need during her visit with us and she was always prepared, excited. She couldn't stop talking about her, just very happy." Both S.B. and K.V. considered A.R. to be their grandchild.

K.V. testified that A.R. started having some behavior problems starting in April 2018. One time, when K.V. and S.B. went to collect A.R. from daycare, she was having an outburst. Heather also reported to them that A.R. was having behavior issues.

10.

Sometimes S.B. had to pick A.R. up from daycare right away because A.R. would not settle down. Heather and her boyfriend (Justin) had moved in together in April 2018.

K.V. testified he had seen Vincent only seven or eight times in the 10 years he had known S.B. K.V. stated: "Out of those 7 or 8 times, Vincent had been intoxicated at least 5 or 6, and every time he wanted to bring physical harm to me, he threatened to hit me, kill me and his violence, along with his criminal background, was really concerning to be around [A.R.]" Heather told S.B. and K.V. at some point that "she was considering allowing Vincent to come back into [A.R.'s] life." K.V. expressed his concerns about that plan as he "felt it was [his] duty as [A.R.'s] grandfather to do so." Shortly thereafter, Heather entirely cut him and S.B. off from A.R. K.V. testified: "Last time we saw [A.R.] at the end of October [2018] was the last time I ever spoke [to] or contacted [Heather]."

Regarding the small claims action he brought against Heather, K.V. testified: "Overall, as [A.R.'s] grandparents we did a lot for [A.R.], we bought her clothes, took her places, provided entertainment. Anything that we did willingly, we never asked for. The only money I ever asked for was the ones that Heather specifically borrowed with the intent to pay back." K.V. noted: "[Small claims] was the only method that we could pursue, that I could pursue. There was no communication, she had blocked our number so no contact could be made. And in the absence of any other agreement, that was the only choice I had."

On cross-examination, K.V. acknowledged there had been periods between 2015 and 2018 when he and S.B. did not visit A.R. The longest such period was a two- or three-month period in 2017. K.V. explained: "I believe it started with Andrew or [Heather] wanting Andrew to be engaged in [A.R.'s] life again and wanting for [A.R.] to spend time with [Andrew R.], the ex-husband." K.V. said he did not object to A.R. spending time with Andrew; rather, it was Heather who "stopped bringing [A.R.] over."

11.

K.V. also noted, with respect to Heather's boyfriend, Justin: "There was a day where he chased us, pulled up against us and cussed us out."

### f. Testimony of Amber N.

Amber N. testified in S.B.'s case. Amber stated: "Vincent is my brother, [A.R.] is my niece, Heather is my niece's mom, and [S.B.] is my mom, and [K.V.] is my mom's boyfriend." Amber was 26 years old and worked as a nurse. Amber lived with S.B. and K.V. for a year and saw them provide care for A.R. As to how frequently A.R. was there, Amber testified: "Most weekends we would … see her at least once and then during the week a couple of times we would pick her up from school and she would be there for a little bit." A.R. was also there overnight on occasions. As to A.R.'s relationship with S.B. and K.V., Amber said: "Well, with my mom, I mean, it was good. It was a grandparent relationship, the same for [K.V.]" As for activities, Amber said: "I mean, we went to the zoo very often, my mom has a swimming pool, so a lot of swimming in the backyard, painting rocks in the front yard." A.R. had her own room in the house. The room "has light purple walls with her name on the wall with butterflies around it, she has a full-sized bed, I believe, in there, and just toys everywhere." From what Amber saw, S.B. and K.V. were a positive addition to A.R.'s life. There were times K.V. watched A.R. by himself; he did a good job. Amber also interacted with Heather: "I would talk to her. I saw her for pick ups or drop off. I mean, if I wanted to see [A.R.], I would reach out to Heather and ask if I could have [A.R.], or maybe have [A.R.] come stay with me in my apartment, things like that."

Amber acknowledged on cross-examination that while S.B. and K.V.'s relationship was in a "good place" presently, there were prior instances of domestic violence. Amber testified: "There is mostly one [incident] that is just in my memory from the day that we moved out of [K.V.'s] apartment. I believe I was a sophomore, and that I was 15, they had gotten into a fight and my mom's arm was shut in a car door or it was – the car – no, it was the door that opened up into the garage, then they fought more

in the garage, then we moved out and then that is when my mom took me to live with my dad and I didn't have contact with her again until 2016." Amber and her brother, Vincent, took S.B. to urgent care after the arm incident, which occurred in 2011.

Amber noted: "[S.B.] and [K.V.] had a very volatile relationship … during that time, a lot of arguing and stuff behind closed doors that I did not see what happened, just hearing the rummage that was going on, but that was the worst [incident]." S.B. and K.V. separated after the arm incident but eventually reconciled. During that period, K.V. had also been rough with Amber's dog one time. After the arm incident, Amber "ended up at [her] dad's house," and S.B. did not contact Amber for the next five years. Amber said she and her brother Vincent are very close and talk a lot, and he had a stable lifestyle now notwithstanding earlier troubles with the law. Amber believed Vincent should "[a]bsolutely" have a role in A.R.'s life. She also noted that she had not recently witnessed any fighting between S.B. and K.V.

### (ii) Respondent Heather B.'s Case

#### a. Testimony of Vincent N.

A.R.'s biological father, Vincent N., testified in Heather's case (Vincent was also a party in his own right). Vincent had had several confrontations with K.V., some on the edge of getting violent. Vincent was also aware of the incident in which S.B.'s arm got "slammed in the door" during a fight with K.V. Vincent and Amber took S.B. to urgent care following that incident. Vincent testified: "Later that night, me and a buddy … went to [K.V.'s] apartment, rang his doorbell. He came down and we confronted him about what happened and just was trying to ask him, you know, what the deal was, why he did that. He just laughed in my face and slammed the door. And that was it."

Vincent said he had A.R. every other weekend at the present time. Vincent did not want S.B. to have contact with A.R. He gave the reasons: "There's a lot. I mean, one is definitely her boyfriend. I just don't want her around a toxic, violent environment. And also, you know, I don't think [S.B.] is a good example to my daughter. She's just never

been a motherly figure to … any of us kids." Vincent believed A.R.'s best interests lay in not having contact with S.B. and K.V., not even supervised visitation.

At some point, after an altercation with K.V., Vincent told S.B. over the phone that he did not want A.R. over at her place anymore. The "phone call ended really nasty." After Vincent "ended [his] relationship" with S.B. and K.V., he and Heather mended their own relationship and "were figuring out stuff."

Since Vincent was estranged from S.B., he "[did] not know what the relationship was with [A.R.] and [K.V.] and [S.B.]" He said: "I took her over here one time when she was a little kid and that was it. So I have no idea." He assumed Heather continued the relationship with them because "she just needed a babysitter or something." At this point, both Heather and Vincent had the "same concerns" about contact with S.B. and K.V.; as to K.V., Heather was "terrified of him, scared of him, all the same things [as Vincent was]."

### b. Testimony of Heather B.

Heather B. testified on her own behalf. Heather said she utilized S.B. to watch A.R. She said: "I was a single mom, and I needed help. And I took help where it was offered, which was playing with fire." A.R. began acting out in April 2018, when she had the most frequent contact with S.B. and K.V. "She had no rules, no boundaries. She was a three-year old child who got whatever she wanted." S.B. and K.V. told A.R., when she was three years old, "that her dad is not a good person and something along the lines of the police handcuffed him and threw him on the ground." Heather "went to counseling … [to see] how to help [A.R.] since she was so little." Heather felt K.V. was obsessed with A.R. Heather also said that towards the end she was concerned about pedophilia and feared K.V. was grooming A.R.

Currently, A.R. never spoke of S.B. or K.V.; "[s]he talk[ed] about Vincent and his life." Heather did not believe A.R. remembered S.B. and K.V.; they had been out of her life for almost four years. Heather believed it was not in A.R.'s best interests to have

14.

visitation with S.B. or K.V.  Heather said:  "I feel it would cause her to regress in her behavior and her emotional, mental, and -- any well-being."

Heather and her boyfriend, Justin, moved in together in February 2018.  Around June 2018, Heather was distressed about the lack of engagement Vincent had with A.R.  Heather testified:  "It hurt my feelings that they didn't have a close relationship.  And Vincent did reach out pretty quick after that, actually."

Heather read out a text message she had sent to S.B. in January 2019, after hearing from her mother that S.B. planned to sue for guardianship of A.R.  In the text message, Heather referred to "extreme lengths" that S.B. was going to, in order to see A.R.  The text message further stated:  "This entire situation is where it is at this moment because you said, 'We're throwing in the towel,' which I don't take lightly, as I shouldn't."

Heather summed up the situation:  "What happened was [S.B.], for the third time, was choosing to walk out of [A.R.'s] life and demanded to see [A.R.] about a month later.  And when you're walking out of my daughter's life for the third time – she's not a disposable object.  As [S.B.] said and [K.V.] have said, it causes damage, which it does.  So you don't get to come in and out of my daughter's life when you're happy and upset again.  It's damaging.  She's not a disposable object.  So, ultimately, they walked out, and I didn't allow them back in."

## B.    Trial Court's Statement of Decision

In a detailed statement of decision, the trial court ruled:  "[T]he court denies the request for grandparent visitation to Petitioner and visitation to [K.V.]"  We will excerpt the trial court's statement of decision below as it concisely sets forth the legal framework applied by the court (this is not challenged by S.B. on appeal) and the court's analysis, findings, and ruling.  The court first set forth the question before it:

> "The matter is before the court on the issue of grandparent visitation with the child, [A.R.].  The matter was commenced by the filing of a Petition for Grandparents Rights on March 11th 2019.  The Court tried this matter over five days in 2021, on August 3rd 4th and 24th, October 18th

15.

and 19th. [S.B.], ("Petitioner") is the paternal grandmother of the child.… Respondent [Heather B.], ("Respondent") [is] the child's mother.… The child's biological father [Vincent N.], Petitioner's son, is also a party to this action. [¶] … [¶] Currently, joint legal and physical custody of [A.R.] is shared between [Vincent N.] and Respondent.

"Petitioner, [Vincent N.'s] mother and the paternal grandmother of [A.R.], initially brought this action against Respondent on March 11, 2019, seeking grandparent visitation. Petitioner amended her Petition on June 14, 2019, seeking both grandparent visitation and non-parent visitation for herself and her boyfriend, [K.V.] [S.B.'s] request for order included the following pleas: 1) regular scheduled visitation with [A.R.] to occur at least once per week and including some overnights, 2) an order directing [Heather B.] to have either Petitioner or [K.V.] provide child care as needed or is appropriate for [A.R.] during [Heather B.'s] work hours in lieu of any child care program, and 3) an order allowing [S.B.] and [K.V.] to attend and participate in [A.R.'s] school and extracurricular activities. [¶] The Respondent and [Vincent N.] are united in their objection to visitation for both Petitioner and [K.V.]"

Next, the court addressed the applicable legal framework:

"Grandparents are provided a **statutory** framework for requesting visitation under California Family Code 3102 through sections 3104. Family Code section 3104 provides a basis by which a grandparent may petition for visitation with his or her grandchild in cases in which the child's parents are not married or are permanently separated.

"California's legislature limited section 3104 by creating rebuttable presumptions against grandparent visitation 'if the [child's] parents agree that the grandparent should not be granted visitation rights (§ 3104, subd. (e)), or if the parent awarded sole custody objects to grandparent visitation (§ 3104, subd. (f)). Section 3104 gives 'special weight' to the parents' decision, if the parents agree that visitation is not in their child's best interest. The Supreme Court recognized as much by citing with approval section 3104, subdivision (e). (*Troxel v. Granville* (2000) 530 U.S. 57, holding that a fit parent has a constitutional right to make decisions regarding the care, custody[,] and control of their children. (plur. opn. of O'Connor, J.).) ([*In re Marriage of Harris* (2004)] 34 Cal.4th 210, 266.)

"Undoubtedly, the statutes authorizing the family court to order visitation between a child and nonparent are subject to the limitations and conditions derived from a parent's constitutional, substantive due process right to make decisions regarding the care, custody, and control of his or

16.

her children.  The Federal Due Process Clause of the Fourteenth Amendment does not permit a state to infringe on the fundamental right of parents to make child-rearing decisions simply because a judge believes a 'better' decision could be made than that of a child's parents.  (*Troxel v. Granville*, *supra* (plurality opinion); see also *Zasueta v. Zasueta* (2002) 102 Cal.App.4th 1242, which held that the family court should give special weight to a parent's decision regarding visitation with a nonparent rather than substituting the court's own beliefs and feelings.)

"Because a parent has a constitutional right to decide who, if anyone, may visit with his or her child, the court may **only** order visitation to a grandparent under Family Code section 3104 when two prerequisites are met:

"•      The court finds that there is a preexisting bond between grandparent and child such that visitation is in the child's best interest; **and**

"•      The court balances the child's interest in visitation against the parents' right to exercise parental authority.

"The second prong of the statutory provision is consistent with the constitutional requirement of a presumption in favor of a fit parent's wishes regarding nonparent visitation.  (Family Code section 3104(a); *Marriage of Harris* (2004) 34 Cal.4th 210, 222).  The right to third-party visitation, whether by grandparents or others, is purely statutory.  See (*Rich v. Thatcher* (2011) 200 Cal.App.4th 1176, 1180.)  No federal or California case has held that there is any inherent or constitutional 'grandparent right' to visitation.  Where the parents object, the court is required to find by ***clear and convincing evidence*** that (1) visitation would be in the best interest of the child and (2) the denial of nonparent visitation would be detrimental to the child; the initial burden of proof is on the nonparent petitioner for visitation, not the objecting parents (see *Troxel v. Granville* (2000) 530 US 57, 67; see also *Marriage of W.* (2003) 114 Cal.App.4th 68, 74; *Marriage of Gayden* (1991) 229 Cal.App.3d 1510, 1520.)"

Finally, the court analyzed the facts of this case in relation to the applicable legal framework.  The court initially addressed the first prong of Family Code section 3104 and found "there was a preexisting relationship between grandparent and grandchild that 'has engendered a bond,' such that visitation would normally be in the child's best interest."  (Unnecessary emphasis omitted.)  The court noted "the totality of the evidence supports a strong grandparent bond between Petitioner, [K.V.] and [A.R.] from 2015-

17.

2018."  The court discussed the relevant evidence underlying its determination:  "The parties picked up the child from day care several times per week, were involved in the child's regular schedule and had frequent and consistent contact with the child during that time.  Beyond the frequency of the contact, multiple photographs and exhibits introduced during the trial demonstrate that the parties were engaging in a grandparent relationship with the child during the same period.  The parties took trips together and celebrated milestones with the child and Respondent."

The court further observed:  "Additionally, the child had a designated room at Petitioner's home and the parties held each other out to the public, the child, each other and in documents as 'grandparents.'  Petitioner and [K.V.] contributed significant financial assistance and support to Respondent and the child in regard to day care, attorney's fees, health care, birthdays, etc.  Communication between the parties in regard to [A.R.] demonstrates the significant level of involvement the parties had in the child's life; despite any contention otherwise, the court finds that there is sufficient evidence to show that [A.R.] engendered a bond with both Petitioner and [K.V.] during the time period of 2015 and 2018."

The court then turned to the second prong of Family Code section 3104, stating with regard thereto:  "The court finds that the child's interest in visitation, when balanced against the parent[s'] right to exercise parental authority[,] is outweighed."  (Unnecessary emphasis omitted.)  The court noted that in order to determine, under the second prong of Family Code section 3104, that grandparent or nonparent visitation was warranted *over the objection of both parents*, "the court must find *by clear and convincing evidence …* that (1) visitation would be in the best interest of the child and (2) the denial of nonparent visitation would be detrimental to the child."  (Italics added.)

The court thoroughly summarized all the evidence relevant to this determination.  The court emphasized the relevance of the evidence that showed a contentious relationship between S.B. and K.V. on the one hand and Heather and Vincent on the

18.

other. The court referenced the fact that S.B. and Vincent were estranged, and further noted that S.B. and K.V. had at least one falling out with Heather over her decision to facilitate a closer relationship between Vincent and A.R. The court observed: "Both the Petitioner and [K.V.] admitted that they were adverse to the introduction of [Vincent] into the child's life because of concerns regarding his criminal history and inconsistency in the child's life." The court noted Heather and Vincent viewed S.B. and K.V. as "unsupportive and overly interfering" in this context.

The court pointed out that the relationship between S.B. and K.V. on the one hand and Heather on the other, deteriorated further when S.B. and K.V. "sued [Heather] in small claims court seeking payment of loan[s] provided to [her] for P.G.&E., payments for her former divorce attorney, daycare payments, monies for a rug shampooer, food and beverages for multiple birthday parties, health insurance premiums, doctor bills, daycare sleeping mats and miscellaneous expenses." The court observed: "Significantly, the parents[] also expressed concern that the child would be exposed to domestic violence in the Petitioner and [K.V.'s] home. Both [Vincent] and [Amber] (his sister) described a previous domestic violence incident between [K.V.] and Petitioner, wherein Petitioner sought medical care." The court noted: "Further testimony introduced by the Petitioner's expert, Dr. [Engeln], addressed the existence of a prior domestic violence allegation between [K.V.] and a former girlfriend, wherein it was alleged he threatened her with a knife and a temporary restraining order was issued (more than twenty years ago)." Regarding Dr. Engeln's testimony about the current relationship between S.B. and K.V., as well as that couple's relationship with A.R. and her parents, the court found his testimony "lacked probative value and was largely speculative, particularly since neither parent was interviewed."

The court discussed Vincent's interactions and experiences with S.B. and K.V., and the concerns A.R.'s parents had regarding S.B.'s home environment. The court noted: "[Vincent] believed the environment at Petitioner's home to be toxic, he did not

19.

want [A.R.] to be exposed to it. While [K.V.'s] previous domestic violence allegation was dated in time and not significantly probative as to the current case, the parents' testimony focused their concerns on the volatility of the Petitioner and [K.V.'s] relationship and the domestic violence allegations in the current relationship. In addition to the above objections, Respondent also testified that she believed the child experienced behavioral issues while staying at Petitioner's home."

The court observed: "In October of 2018, visitation between [A.R.], Petitioner and [K.V.] stopped and did not resume. The child has been out of contact with the Petitioner and [K.V.] since that point. Respondent testified that issues arose after [K.V.] was reluctant to return the child after visitation; she testified that she felt that he objected to other men being around the child and became uncomfortable with the relationship between him and [A.R.] Respondent indicate[d] she had concerns that [A.R.] was being 'groomed' and perceived that [K.V.'s] interest in the child was concerning. Respondent expressed concern that [K.V.] had made comments in regard to taking [A.R.] [out of the country] and was seen outside of her day care after the parties had terminated visitation."

The court thus analyzed the evidence in making its determination as to the second prong of Family Code section 3104. The court also stated: "In considering the parents' concerns, there is no allegation of Respondent's parental unfitness. Although there were a number of issues raised as to [Vincent's] criminal history and his initial relationship with the child, there was insufficient evidence to place [Vincent's] parental fitness at question. According to the evidence, his criminal activity is dated, there was uncontroverted testimony that he's been sober for a period of five years and he currently exercises regular and consistent visitation with the child without issue. In fact, both parents appear to have worked past any conflict that existed in their co-parenting relationship and are united in their belief that visitation with the Petitioner and [K.V.] is not in the child's best interest: both Respondent and [Vincent] contend that any court ordered visitations between [A.R.] and Petitioner or [K.V.] would not be in the best

interest of the child and would be detrimental to her. They contend that forced visitations would in fact be detrimental to [A.R.]"

The court concluded:

"It is clear that the parents[] have a conflict-ridden history with the Petitioner and [K.V.], which at least in regard to [Vincent], precedes the time period in question here. As the parents of [A.R.], they are united in the belief that the child should not have any contact or visitation with Petitioner and [K.V.] They have a number of concerns about [A.R.'s] exposure to the parties that, despite the child's prior bond to the Petitioner and [K.V.], are based on their own experiences and appear both subjectively and objectively reasonable. It is the Petitioner and [K.V.'s] burden to show with clear and convincing evidence that their requested visitation would be in the best interest of the child and that the denial of the visitation would be detrimental to the child. That burden was not met. Although the child may have had engendered a bond with Petitioner and [K.V.] during the three years that visitation occurred, the volatility and conflict between the Petitioner, [K.V.] and the parents is pervasive. The parents' numerous concerns regarding visitation were substantiated by the evidence. There is insufficient evidence to show that the denial of visitation would be detrimental to the child. The court has balanced the child's interest in visits against the parents' right to exercise parental authority, and believes that the parents' rights outweigh the child's interests in visits based on the evidence submitted."

The court ruled: "Based on the above, the court denies the request for grandparent visitation to Petitioner and visitation to [K.V.]"

## DISCUSSION

**I.     The Trial Court Properly Evaluated Whether the Denial of Visitation Would be Detrimental to the Child, Under the Second Prong of Family Code Section 3104**

S.B. argues: "The court prejudicially erred and abused its discretion by failing to properly analyze the element of detriment to the child pursuant to [Family Code] section [3104]." (Italics omitted.) She contends: "The request for grandparent visitation requires a finding by the court as to … whether the denial of visitation would be detrimental, or harmful to the child … [and the court] must consider the nature of the

21.

relationship between the child and the nonparent." She further argues: "Here, the Court's Statement of Decision did not analyze the issue of detriment to the child in removing her from a primary caregiver." Finally, she posits: "Rather, after concluding there was significant and substantiated conflict, the trial judge simply concluded that there was insufficient evidence to show that the denial of visitation would be detrimental. [Citation.] This is an abuse of discretion and should be reversed."

S.B.'s argument is perplexing in light of the trial court's detailed analysis of the evidence relating to the question whether a denial of visitation would be detrimental to the child. The trial court noted there was a severely contentious relationship between S.B. and K.V. on the one hand and A.R.'s parents on the other. The court credited the concerns of A.R.'s parents that the environment of S.B.'s home was potentially unhealthy and even unsafe for A.R. in light of evidence that the relationship between S.B. and K.V. was volatile and marred by domestic violence. The court also considered the fact that Heather feared that K.V. was oddly obsessed with A.R. and was "grooming" her. In addition, the court considered Heather's testimony that A.R. exhibited unsettling behavior issues when left in the care of S.B. and K.V. The court observed that while A.R. developed a close bond with S.B. and K.V. during the period from 2015 to 2018, she had been out of contact with them for several years.

Ultimately, the court found that A.R.'s parents "have a number of concerns … that, despite the child's prior bond to the Petitioner and [K.V.], are based on [the parents'] own experiences and appear both subjectively and objectively reasonable." The court further found that "[t]he parents' numerous concerns regarding visitation were substantiated by the evidence." As for the testimony of Dr. Engeln in support of visitation for S.B. and K.V., the court found his testimony "lacked probative value and was largely speculative."

This record reveals the court considered all the relevant evidence on the issue of whether the denial of visitation would be detrimental to the child. S.B. does not pinpoint any evidence the court found probative but failed to consider.

The court concluded: "It is the Petitioner and [K.V.'s] burden to show with clear and convincing evidence that their requested visitation would be in the best interest of the child and that the denial of the visitation would be detrimental to the child. That burden was not met." The court's analysis and determination cannot be said to be an abuse of discretion.

## II.     Issue of Tier II Mediation

At the behest of both parties, the trial court had ordered a Tier II mediation; the mediation process was to include "attempts to interview the child." The court warned the parties at the time: "I think all parties need to understand that if for some reason a quarantine or other medical issue comes up, perhaps there may need to be a re-referral."

S.B. contends: "[Heather] refused to comply with the court's order [in that she] refused to produce the child for mediation." S.B. further contends: "[T]he Statement of Decision makes no mention of the blatant disregard for [the court's] authority, which deprived the judge of critical insight into the emotional and psychological state of the child following the separation from her grandmother." S.B. argues: "The court's failure to hold a party accountable for breaches of a court's order, especially when the failure to comply prejudices the other party's ability to meet their burden under the law, creates a perverse incentive for parties to refuse to comply with orders when the evidence may be harmful to their position. That, too, is an abuse of discretion and reversible error."

S.B.'s contentions are meritless. Furthermore, they are not well taken as S.B. has failed to cite to critical parts of the record that are directly relevant to this issue.

On October 13, 2020, the court set the matter for a Tier II mediation on November 18, 2020, stating: "And Family Court Services may be able to accommodate – you know, if the child needs to be interviewed." The parties thereafter returned to court on

23.

December 9, 2020, as previously scheduled.  The court was told, at the December 9, 2020 hearing, that during the mediation process, Heather and Vincent agreed on a visitation schedule for Vincent.  Heather's counsel also informed the court that A.R. did not attend the mediation.  Heather's counsel said:  "[T]he child was sick, your Honor, at the time.  And there was some other – as well as being sick, the child was trying to get through the last part of the school."  S.B.'s counsel countered that, according to S.B.'s information, the child was not sick but rather had a "doctor's appointment to check her iron level that day."  S.B.'s counsel said the mediator wanted to talk to the child, but Heather did not reschedule the meeting.

The court then asked both counsel:  "Are the parties asking for a re-referral [to mediation] or a contested hearing?"  The court said:  "I already ordered [A.R.] be interviewed and [Heather] didn't make her available for the interview.  So I'm trying to remain consistent with what I already indicated to the parties.  [Heather] needs to make sure the child is available."  The court also noted:  "If we're setting a contested hearing, I don't think we're going to be doing that any time before March.  And so, the soonest available date I have for a return on a Tier 2 is February 4th."  S.B.'s counsel responded:  "Your Honor, I spoke to my client, she doesn't want to push it any further, the contested hearing.  So if the first available is in March, we'll set it now."  S.B.'s counsel added:  "We want the soonest available date [for contested hearing] because we're confident there's evidence to show there's an established bond between the grandparent and the child.…  We'd just like the soonest available date."  The court indicated the soonest available (tentative) date for a contested hearing was March 23rd.

The court repeated the information to ensure everyone understood the situation:  "The soonest available date is February 4th for a return, if the Court were to send the parties to a Tier 2.  [¶ ] … [¶ ]  We would set the [contested] hearing when the parties return on February 4th."  S.B.'s counsel replied:  "But the March 23rd date wouldn't be available [then], and that's why we're requesting this matter be set for contested hearing

on March 23rd." The court clarified: "All right. So I'm not going to set the February 4th hearing; correct? I'm not going to send the parties to a Tier 2. We're setting the tentative March 23rd contested hearing date?" S.B.'s counsel confirmed: "That's correct, yes." The court set the matter for contested hearing.

The record is clear that S.B. represented to the court she was "confident there's evidence to show there's an established bond between the grandparent and the child"; told the court *not* to re-refer the matter to Tier 2 mediation for A.R. to be interviewed; and exercised her right to proceed directly to contested hearing.[1] Accordingly, S.B.'s complaints that the court abused its discretion by "fail[ing] to hold [Heather] accountable for breaches of a court's order, especially when the failure to comply prejudices [S.B.'s] ability to meet [her] burden under the law," are unavailing and unpersuasive.

## III.  A.R.'s Daycare Records from Brighten Academy

S.B. argues the trial court "prejudicially erred and abused its discretion by refusing to admit relevant evidence relating to the child's Brighten Academy records, which were highly relevant and illustrated that the child suffered from violent outbursts and meltdowns following the [complete] disruption in her relationship with S.B." (Italics omitted.)  S.B.'s contentions lack merit.

When S.B.'s counsel sought to admit A.R.'s records from Brighten Academy, Heather's counsel objected. Heather's counsel stated: "I would object to this one, your Honor, Exhibit 22. I can't remember. I thought the person that testified [i.e., Beth F.] was from the first day care center [Kids Kare], not the second day care center [Brighten Academy]." Heather's counsel indicated the Brighten Academy records were not authenticated. The court then looked though its notes and confirmed that no one from Brighten Academy had testified for purposes of admitting the records. At that point, S.B.'s counsel said: "That's fine. If the adequate foundation wasn't laid, we'll withdraw

---

[1]     S.B. did not provide cites to the parts of the record reflecting these facts.

it." The court then noted: "We'll show Exhibit 22 as withdrawn." After some additional back and forth between the court and counsel, S.B.'s counsel added: "And maybe just to cut to the chase, I'm fine withdrawing that [exhibit], your Honor. It's probably redundant at this point." The court reiterated: "All right. We'll show that as withdrawn."

Thus, the record shows S.B.'s counsel did not dispute there was inadequate foundation for admitting the Brighten Academy records into evidence, and further indicated he was "fine" with withdrawing the records as an exhibit regardless of the matter of foundation. In light of her counsel's willing withdrawal of the records as an exhibit, S.B.'s argument the trial court committed reversible error in failing to admit them, is unavailing. Nor has S.B. shown an adequate foundation was laid to admit the records (she does not address the issue of foundation at all); in turn, she has not established error.

Furthermore, as S.B.'s counsel noted in withdrawing the Brighten Academy records, they were redundant in light of other evidence in the record showing ongoing behavior problems exhibited by A.R., including in December 2018 at Kids Kare. A.R. was dismissed from Kids Kare in December 2018 on account of behavior-related incidents. Thereafter, she attended Brighten Academy from January 2019 to October 2019. Heather readily acknowledged in her trial testimony that, throughout the time A.R. was at Brighten Academy, she had had outbursts, as documented in incident reports. Furthermore, Heather discussed the content of some of the incident reports and the fact A.R. had to withdraw from Brighten Academy on account of the incidents. In short, evidence of A.R.'s behavior-related incidents at Brighten Academy was presented through other means, and consequently the need to introduce the written daycare records was diminished. Even assuming the records were erroneously excluded, S.B. has not established such error was prejudicial.

## IV. Text Messages of Lisa (Heather's Mother)

S.B. argues the trial court "abused its discretion" in not admitting into evidence certain text messages sent by Lisa to S.B. (Italics omitted.) S.B. does not include, in her brief, the actual text of the text messages at issue, or cite to a part of the record reflecting the text of these messages. Therefore, the number and content of the text messages relevant to her argument is unknown. S.B. simply asserts "the text messages illustrated that [A.R.] was having meltdowns and that she was constantly crying for [S.B.] and asking Lisa to have [S.B.] come get her."

Lisa did not testify at trial. S.B. nonetheless argues the trial court should have admitted Lisa's text messages "to show that it was Heather (not S.B., as Heather had alleged) who cut off all contact between [S.B.] and [A.R.]" We fail to see how text messages to the effect that "[A.R.] was having meltdowns" and was "crying for [S.B.]" tend to show it was Heather, and not S.B., who "cut off all contact" between A.R. and S.B.

S.B. further argues that Lisa's text messages should have been admitted, not for the truth, but to impeach Heather's testimony that S.B. cut off contact with A.R. However, even assuming Lisa's text messages showed that Heather cut off contact between S.B. and A.R., *Lisa's text messages to S.B.* would only be relevant and serve to impeach *Heather's testimony* if they were admitted for the truth.

We note that not only has S.B. failed to provide a cite for the actual text messages at issue, but she has not addressed the issue of authentication of these text messages. Nor has she cited the Evidence Code or any case authority in support of her arguments. Finally, she has not shown prejudice. We conclude S.B. has not shown error, let alone reversible error.

## V. Therapeutic Visitation

The operative petition in this matter was S.B.'s amended petition for grandparent and nonparent visitation, which sought an order granting "regular, scheduled visitation"

with A.R. to S.B. or S.B. and K.V., as well as an order directing Heather to use S.B. and/or K.V. for childcare and allowing S.B. and K.V. to participate in A.R.'s "school and extra-curricular activities."

Nonetheless, S.B. argues: "The court prejudicially erred to the extent that the court failed to consider [S.B.'s] request for therapeutic visitation or to the extent that the court considered a request for visitation to [K.V.]"

S.B. does not provide a cite to the part of the record where a request for therapeutic visitation was actually made. Nor does S.B. provide any authority for the proposition that the court's consideration of requests for relief included in the operative petition itself, somehow constitutes reversible error. We are not persuaded by her arguments.

Finally, since the trial court properly determined that S.B. had not met her burden of proof and visitation was therefore not warranted, there was no point in the court separately considering the issue of therapeutic visitation to the extent therapeutic visitation is a prelude or lead-in to regular visitation.

## DISPOSITION

The judgment is affirmed.

SMITH, J.

WE CONCUR:

PEÑA, Acting P. J.

DE SANTOS, J.

28.